## Stanley Drug Company v. Finance Realty Corporation et al.

*Abraham Wernick,* for plaintiff.

*Henry Arronson, Morris Wolf* and *Simon Pearl,* for defendants.

KUN, J., May 6, 1931.—The plaintiff filed its bill alleging that it was the lessee of a portion of the premises mentioned therein from the defendants,

and that, the premises having been destroyed by fire, it claimed on that account to be absolved from the further payment of rent under its lease, praying that the court so declare and direct the defendant corporation to surrender up the lease for cancellation. The defendant Kass was added as a defendant because it was alleged that he as agent had threatened to cause judgment against the plaintiff to be confessed on the lease. A preliminary injunction was issued, security being entered, enjoining the defendants from proceeding to collect any rent on the lease. Some proofs were taken, and thereafter the defendants filed an answer denying the destruction of the demised premises, and alleging the damage could be repaired within a comparatively short time, and at a comparatively small cost, which they offered to pay. Further proofs were taken, in connection with which it was stipulated by the parties that the proofs taken might be considered as having been presented at a final hearing, so that the court might make a final adjudication of the rights of the parties promptly.

From the bill, answer and proofs, the court makes the following

## Findings of facts.

1. On May 21, 1926, Finance Realty Corporation, one of the defendants herein, leased and demised unto the plaintiff, the Stanley Drug Company, "all that certain first floor and basement 1024 Chestnut Street (excepting portion occupied by heating system), 2d floor rear of 1024 Chestnut St. and 2d & 3d floors rear of 1026 Chestnut St. in the City of Philadelphia, for the term of ten years from the 21st day of May, A. D. Nineteen hundred and twenty-six (1926) for the annual rent or sum of $25,000. dollars payable monthly in advance, in sums of $2,083.34 on the 21st day of each month during the said term, or any renewal thereof, which the Lessee hereby covenants to pay without demand at the office of Joseph H. Kass, Philadelphia, or at such other place as Lessor in writing may require." A true and correct copy of the lease is attached to the bill of complaint filed in the case, and marked Exhibit "A."

2. On October 19, 1926, an addendum to the lease dated May 21, 1926, was executed between the parties, wherein and whereby it was agreed, *inter alia*, that for an additional sum of $600 per annum, payable in monthly payments of not less than $50, the defendant lessor, Finance Realty Corporation, would furnish heat to reasonably warm the first floor of the premises. A true and correct copy of the said addendum is marked Exhibit "B" and attached to the bill of complaint.

3. In pursuance to the terms of the aforesaid lease, on or about May 21, 1926, plaintiff did take possession of the demised premises.

4. The premises demised consist of the following:

(a) The basement of No. 1024 Chestnut Street, excepting that portion which is occupied by the heating system, containing floor space which is approximately twenty feet in width and approximately 175 feet in depth, giving the lessee a floor space of approximately 3500 square feet.

(b) The first floor of No. 1024 Chestnut Street, consisting of twenty feet in front on Chestnut Street, and extending of that width in length or depth, between parallel lines at right angles to said Chestnut Street, a distance of approximately 230 feet to Sansom Street, comprising floor space of approximately 4600 square feet.

(c) A mezzanine floor immediately above the first floor which is approximately twenty feet in front and running back southwardly in depth approximately twenty-five feet, comprising floor space of approximately 500 square feet.

(d) The second floor of the rear of No. 1024 Chestnut Street, which is approximately twenty feet in front by approximately fifty-seven feet in depth, comprising a floor space of approximately 1140 square feet.

(e) The second floor rear of No. 1026 Chestnut Street, which is approximately twenty feet in front and approximately thirty-seven feet in depth, comprising a floor space of approximately 740 square feet.

(f) The third floor rear of No. 1026 Chestnut Street, having an approximate width of twenty feet and approximately thirty-seven feet in .depth, comprising a floor space of approximately 740 square feet.

5. On Sunday, March 15, 1931, without any fault on the part of the lessor, a fire originated on the third floor of premises No. 1024 Chestnut Street, in consequence of which the upper floors and some plaster and bricks fell through a considerable part of the ceiling above the front portion of the first floor of premises No. 1024 Chestnut Street, piling up in and upon the floor of said portion which has a front of approximately twenty feet on Chestnut Street and extending to a depth of approximately sixty feet; likewise the bulk window frames and glass of the first floor front of premises No. 1024 Chestnut Street were destroyed or removed through no act on the part of the landlord.

6. There was no fire on the first floor front of No. 1024 Chestnut Street which consumed any portion of it, but burning embers of some of the material which fell through the first floor ceiling with the rest of the débris from the upper floors charred some of the fixtures in the front store, all of which became evident when the débris was removed by stipulation of the parties at the conclusion of the hearing.

7. The only portion of the demised premises that was destroyed was the ceiling over the front store of No. 1024 Chestnut Street to a depth of about sixty feet of a.total depth of 230 feet to Sansom Street, and the bulk windows of said store.

8. Chestnut Street is one of the principal business streets of Philadelphia. Sansom Street is becoming a general business street, but at the point of the location of the demised premises it is what may be termed a rear street, the Sansom Street end of the premises being used largely for receiving goods and merchandise.

9. On account of the great weight of the débris on it, a number of posts were placed in the cellar under the joists supporting the floor of the first floor front store as a precautionary measure. It is not determined by the proofs whether this was done by the municipal authorities, the insurance company or the landlord. There is no evidence that after the removal of the débris such supports are required to maintain the floor, or that they may not with perfect safety be removed. The floor was in no sense destroyed. The damage to it was slight.

10. The walls of the building, so far as they are required for the demised premises, are in no sense damaged or destroyed.

11. Either the municipal authorities or the insurance company have placed wooden braces between the east and west party walls above the demised premises as a precautionary measure.

12. The portion of the ceiling over the first floor front of premises No. 1024 Chestnut Street ·which broke through, and the bulk windows of said store and other portions of said front store, incidentally affected, can be restored within a comparatively short period of time, not exceeding two weeks from the date of the commencement of the work, to the same condition that they were in immediately prior to the occurrence of March·15, 1931, at a cost of about $6000, which is a comparatively small portion of the rent reserved in

the lease, and which the lessor has offered to do forthwith without prejudice to its rights.

13. The first floor and basement of No. 1024 Chestnut Street, running back to Sansom Street, a depth of 230 feet, as well as the rest of the entire demised premises, remain intact, excepting the first floor bulk windows of No. 1024 Chestnut Street and the ceiling over the front portion of the same, not exceeding a depth of sixty feet, which were destroyed. Likewise, the second and third floors rear of No. 1026 Chestnut Street are intact.

14. The lessor has not taken possession of or exercised any control over any part of the demised premises.

15. On April 3 and 4, 1931, the plaintiff removed from the demised premises a large quantity of goods, wares and merchandise without the consent of the defendant lessor, which the court directed the plaintiff to return to said premises.

16. The minimum monthly rental, amounting to $2083.34, together with the sum of $50, mentioned in the addendum of October 19, 1926, was not paid on March 21, 1931, nor has any rent been paid by the plaintiff since.

## Discussion.

This case involves the question of the application of the exception to the general rule at common law, that, in absence of an express provision in the lease of real property to the contrary, where lands are the subject of the demise and the buildings thereon are accidentally destroyed before the end of the term, the destruction of the buildings by fire, tempest or flood does not discharge the covenant to pay rent. It has been stated that the reason for this severe rule is that the land is deemed the subject of the demise and the buildings a mere incident, or, as it was stated in Helburn & Co. *v.* Mofford, 70 Ky. (7 Bush) 169:

"This rule, though at first view appears harsh and rigorous, upon a closer examination will be found to be reasonable, and to comport with principles to which we submit in analogous cases without questioning their propriety. The reason for the rule seems to be that as the tenant has expressly covenanted to pay the rent, and has not by his contract provided against his liability, notwithstanding any accident by inevitable necessity, the law cannot interpose."

This seems to state a more reasonable ground for the general rule.

Yet even at common law an exception to the general rule was developed, as where the lease is merely of a portion of a building, such as a room, an apartment, a store and/or certain floors, and there are no covenants to repair or rebuild. In such cases, it has been held that the destruction of the premises terminates the lease: 35 C. J. 1059, § 225; 2 Underhill on Landlord and Tenant, 1342, § 789; Moving Picture Co. *v.* Scottish Union Ins. Co., 244 Pa. 358.

The question in the case before the court is, what meaning is to be given to the expression "destruction of the premises," and if this is ascertained, there will be little difficulty in deciding the case on the facts which have been developed. The precise point has not heretofore been adjudicated in this jurisdiction. Mr. Underhill states the important exception to the general rule as follows (page 1342, § 789):

"Where, however, the principal subject of the demise is not land, but a room, floor or an apartment in a building and the building is destroyed, this rule [the general rule] does not apply. Under such circumstances the lease is at an end, the interest of the tenant under it is destroyed and his liability

to pay under a covenant to pay rent is extinguished. This exception to the general rule is based upon a presumption that the floor, room or apartment was the principal subject matter of the hiring and that therefore the interest of the tenant in the lease was to continue only as long as the subject matter of the lease existed. . . ."

And again at page 1344, § 789, of the same volume:

"The rooms or portion of the building occupied by the tenant must be actually obliterated or so far destroyed that they will have to be substantially rebuilt. If they are merely damaged so that the tenant can occupy them, repair this damage and restore them to their original condition he is bound to remain and do so, unless the landlord has agreed to repair, and he will have to pay rent, whether he remains or abandons the premises."

While the learned author uses the word "obliterated" and in some cases the word "annihilated" has been used in the same connection, as in Cusick v. Woolworth, 4 D. & C. 807, 811, by Judge Maxey, now a member of the Supreme Court, it may be assumed that these words were used merely as synonyms of the word "destroyed," which is more generally used, but for the purpose perhaps of emphasizing the idea of "destruction" of the thing out of which the rent issues, which is the real basis for the application of the exception to the general common-law rule of liability of the tenant to pay rent.

The exception to the general common-law rule developed on a consideration of leases of rooms or apartments of upper floors, so that on the destruction of the premises in which they were contained, by fire or otherwise, there was nothing left but a space in the air, something to which no rent could attach, in which case the tenant was, of course, absolved from his covenant to pay it. The thought was thrown out by Judge Maxey in the Cusick case that where a lease, as in that case, included a basement as well as a first floor, there might be an inferential leasing of certain rights in the surface of the land on which the basement rested, involving substantial rights in the surface of the soil, such as the tenant of a mere apartment above the ground floor could not have. It was, however, as he stated, not necessary to base the conclusion of the court in that case on that consideration, "for the very premises themselves which the defendant [tenant] leased were not so destroyed as to come within the rule of law that when the subject-matter of a contract is totally destroyed the contract ends" (p. 813). It is likewise unnecessary for us to pursue this interesting question further in the case before us and for the same reason, though it may be stated parenthetically that the contrary was decided in Stockwell v. Hunter, 11 Metc. (Mass.) 448. However, in that case (p. 454) "the whole 'building' [was] consumed by fire, to such an extent that it was requisite to build anew."

In the instant case, the fire has occasioned merely an interruption of the use by the tenant of a comparatively small portion of the entire demised premises. The proofs in the case disclose that the basement is intact, the remainder of the first floor for a distance of 170 feet (beyond the sixty feet affected at the Chestnut Street end, the entire first floor from the Chestnut Street front to Sansom Street rear covering 230 feet) and the second floor, and two rear floors in the adjoining building are intact and undamaged, and the damage to the front portion of the first floor at the Chestnut Street end, the only portion of the subject matter of the demise which has been affected, requires merely the construction of a ceiling over that portion, replacement of the bulk windows and incidental repairs to replace the property, that is to say, the portion of the property demised to the plaintiff, in the same condition

as it was prior to the fire, work which could be done within a comparatively short time and at a comparatively small cost considering the rent reserved and the term of the lease.

There is abundant authority to support the contention of the defendants that in these circumstances there has been no "obliteration" or "annihilation" or "destruction," whichever expression one may prefer to use, of the demised premises, such as to bring the tenant within the true meaning of the exception to the common-law rule of liability of a tenant under which a tenant of a portion of a building is absolved from his covenant to pay rent when the subject matter of the lease ceases to exist.

We are dealing here with an exception developed in the common law to a hard and fast general rule of liability of a tenant to pay rent, notwithstanding the complete destruction of the buildings and improvements on the land which he leased. There is no doubt that this liability on a tenant's expressed covenant to pay rent has been quite as strictly construed and enforced in Pennsylvania as it has been in any other jurisdiction in which the common-law rule prevails. Manifestly, the exception which was developed to that general common-law rule must be quite as strictly enforced and applied. When it is said that a lessee of rooms or apartments only of a building is relieved of his covenant to pay rent if the building is destroyed, or rather, the subject matter of the lease is destroyed, it means exactly that. It must be destroyed. This does not depend on any play on words or on the choice of words used, whether "obliterated," "annihilated" or "destroyed." The idea is that it is not sufficient for a tenant in such circumstances to show that the subject matter of his lease has been damaged or rendered for the time being untenantable, or that he would be put to some expense in restoring it, if he should want to continue to use it. It depends on the extent of the damage. The point is, however, that mere damage and interruption of use is not sufficient. In considering the extent of the damage done, there is a point which may be reached beyond which it would be improper to refer to the condition as that of mere damage, where it is so extensive and so far-reaching that the subject matter could not very well be restored by mere alteration or repair, but such restoration would involve substantial reconstruction or "building anew." When that point is reached, it is proper to apply any descriptive term which expresses the idea of destruction, whatever the word used, whether "obliterated," "annihilated" or "destroyed."

In Turner v. Mantonya, 27 Ill. App. 500, 501, the court, after referring to the contention of the tenant that there was a destruction of the premises, such as to operate as a determination of his lease, where the evidence showed that the rooms leased were rendered untenantable by fire but there was no description of the condition of the rooms or the extent of the destruction and no proof that the building and rooms could not be readily repaired and rendered tenantable, said, as to the meaning of the rule which would excuse tenants of rooms in a building from the payment of rent, that it must be shown that the part of the building or rooms of the apartments demised have been "destroyed, and this must mean not merely damaged or injured, but annihilated; for if they remain in but a damaged condition the tenant may still occupy them, repair the damage done and restore them to their former condition if he will," citing Smith v. McLean, 123 Ill. 210, and Shawmut National Bank v. Boston, 118 Mass. 125.

The court held that there was no such destruction of the building or of the rooms shown, though no doubt the rooms were rendered untenantable by the fire.

In Jones *v.* Fowler Drug Co., 120 Ky. 157, reported and annotated in 9 Ann. Cas. 105, the ground floor of a property was demised for use as a retail drug store. Part of the building was destroyed by fire without the fault of the landlord or tenant. The drug store was somewhat damaged. The court adopted the rule laid down in the Illinois cases and refused to relieve the tenant of its covenant to pay rent. The court said: "The facts in the case of Nonotuck Silk Co. *v.* Shay, 37 Ill. App., 542, were similar to those in the case at bar, except the injuries to the leased premises in that case were greater, and the court there said [p. 544]: 'The evidence shows very clearly that the premises were not destroyed. They were damaged, but capable of repair. The walls were standing, and the floors substantial, though covered with debris and ice, and in the ceiling a small hole had been burned or broken through.'" This, the court held, did not amount to a destruction of the premises to bring the tenant within the exception to the common-law rule of liability, quoting from 18 A. & E. Ency. (2d ed.) 308, as follows:

"Thus, when apartments in a building are leased without carrying any interest in the land, the destruction of the apartments or building releases the tenant from liability for further rents. It is necessary, however, that they should have been totally destroyed, so that nothing remains upon which the demise may continue to operate; it is not enough that by reason of fire or other casualty they are rendered untenantable, provided the apartments, as such, still exist."

The learned counsel for the plaintiff, passing over the opinion of Judge Maxey in the Cusick case, argues that there is no decision of any appellate court in Pennsylvania which justifies the interpretation of the word "destruction" in this connection as has been adopted in every other jurisdiction where the common law prevails. We shall accordingly pursue the inquiry further.

The interpretation of the word "destruction" in this connection is followed generally in the interpretation of the same expression in leases and statutes referring to the same subject matter.

In Wall *v.* Hinds, 4 Gray (Mass.) 256, the lease provided that if the premises should be "destroyed" by fire or other casualty, then the payment of rent and the relation of landlord and tenant should wholly cease at the election of either party. There was evidence of quite extensive damage caused by fire, exceeding greatly the damage in the instant case.

The following was indicated: The building was occupied as a tavern and operating a house containing more than 100 lodging rooms, twenty of which were occupied by permanent boarders. The fire originated in the attic, the whole inside of which was charred and a hole about six feet square burned in the roof; a cistern in the attic, from which the house was supplied with water, was so damaged as to render it temporarily useless; two of the rooms in the next story were burned; a large quantity of water was thrown upon the building at the time of the fire, which rendered seven of the rooms temporarily uninhabitable, and saturated the ceiling and walls of nearly all of the main part of the house, so that there was a general dampness in that part of it for some weeks; the plastering on the lower and main entry fell off in five or six places, and about ten days after the fire a large piece of plaster weighing about 600 pounds suddenly fell. The court held that the tenant was not relieved, on the ground that no such destruction of the premises had been disclosed by the evidence as to justify a termination of the lease by virtue of the stipulation referred to. The court said (p. 268): "The building was at most only partially injured and could have been repaired for a sum less than a single year's rent." In the instant case the leased premises can be repaired

and restored to their former condition for less than one-fourth of a year's rent and less than one-twentieth of the total rent reserved, considering the fact that the lease has over five more years to run.

A similar provision in a lease was similarly construed in Tedstrom v. Puddephatt, 99 Ark. 193, in which the language of the court below is very much in point (p. 196):

" 'The words in the lease "destroyed by fire" mean the complete destruction of the premises, or at least a destruction to such an extent as to permanently render the premises unfit for the purpose for which they were leased. An injury which merely deprives the lessee of the use of the property for a short time in comparison with the whole term—in this case, 63 days out of three years—[and in the instant case two weeks, out of five years, it appearing the repairs could be made in that time] and which involves but a small part of the building, easily and quickly repaired and restored to its former condition, is not a destruction within the meaning of the law, and did not authorize the defendants [the tenants] to surrender the premises and rescind the lease contract.' "

This was affirmed on appeal in a thorough and well-considered opinion reviewing many authorities from several jurisdictions, and quoting as well distinguished authors, resulting in the conclusion that the word "destroy" or "destruction" used in such connection means substantially:

"That there would have to be such a destruction of the building by fire or other casualty as would permanently unfit the premises for occupancy. If the inability to occupy the premises was only partial or temporary by reason of the fire, then there was not such a destruction of the building . . . as would cause a forfeiture of the lease or a cessation of the rent."

To the same effect, Spalding v. Mumford, 37 Mo. App. 281; Einstein v. Levi, 49 N. Y. Supp. 674; Vanderpoel v. Smith, 2 Daly (N. Y.) 135. The rule is summed up in substantially the same language by Mr. Underhill in his treatise on Landlord and Tenant, volume 2, page 1349, § 792.

In Booraem v. Morris, 74 N. J. L. 95, there was involved the interpretation of the term "destruction" or "total destruction" as used in the Landlord and Tenant Act of New Jersey, which declares that in case of the total destruction of the demised building by fire or otherwise the lease should thereupon cease. The landlord completed the repairs in two weeks. The court held (p. 96) that "a partial destruction of the building, though it render the premises, or a part thereof, untenantable for the purposes of the lease, does not terminate the lease and relieve the tenant from liability for future rents," citing Wall v. Hinds, supra.

In the instant case, a comparatively small portion of the subject matter of the lease was affected, but even that part was not destroyed within the adjudicated interpretations of the term. It was damaged and rendered untenantable for a short time; that is to say, it could be restored to its former condition within about two weeks, whereas the balance of the term is over five years.

Instruction on the subject of the inquiry may also be found in the interpretation of the expressions "destruction" or "total destruction" in relevant opinions of appellate courts in insurance cases. We find in Corbett v. Spring Garden Ins. Co., 155 N. Y. 389, a lucid discussion of the meaning of the term "total destruction of the premises by fire or otherwise," such as to work a termination of the lease under its provisions. Without detailing the damages, such as the burning off of the roof and destruction of the interior, it appeared that the expenditure of $32,000 put the building in substantially as good con-

dition as it was before the fire, a little more than a third of the value of the buildings before the fire, which was stated to be about $90,000. The court held as a matter of law that there was no total destruction by fire within the true intent and meaning of the policy. The court said (p. 393):

"A total destruction, within the meaning of the policy, must mean the complete destruction of the insured property by fire, so that nothing of value remains of it, as distinguished from a partial loss, where the property is damaged but not entirely destroyed. This does not mean that the materials of which the building was composed were all utterly destroyed or obliterated, but that the building, though some part of it may be left standing, has lost its character as a building, and, instead thereof, has become a broken mass, or so far in that condition that it cannot properly any longer be designated as a building. When that has occurred, then there is a total destruction or loss. A total loss does not mean an absolute extinction. It is not necessary that all the parts and materials composing the building are absolutely and physically destroyed, but the inquiry always is whether, after the fire, the thing insured still exists as a building [citing authorities]."

And it further said:

"In this case it is undoubtedly true that the building was damaged to such an extent as to render it untenantable, but to say that it was totally destroyed when the owner restored it for about one-third of its original value, would be to entirely disregard the controlling facts."

The foregoing authorities give one a comprehensive understanding of what is meant by the use of the term "destroyed" or "destruction" in connection with the statement of the exception to the general common-law rule of liability of the tenants, under which a tenant of rooms or apartments in a building destroyed is relieved of the further payment of rent. The plaintiff has attempted to show that the use of the word "destroy" or "destruction" by our appellate courts in the same connection does not have the same meaning as has been given to it, without exception, it appears, in every other jurisdiction. His contention has been induced largely by a misunderstanding on the part of the Illinois Court of Appeals of our case of Hoeveler v. Fleming, 91 Pa. 322. The question in the case of Nonotuck Silk Co. v. Shay, 37 Ill. App. 542, was whether the tenant of a portion of the building was relieved of the payment of rent by reason of the damage done to the building. The court held, as has already been stated, that the tenant continued liable, because there had not been a destruction or annihilation of the leased premises, thus applying the universal rule. However, it was argued in the case on behalf of the tenant that an annihilation of the premises was unnecessary to relieve the tenant, that all that it would be necessary to show was that the tenant had been deprived of the beneficial enjoyment of the premises. Apparently, without studying our case very thoroughly, the court said (p. 548):

"Hoeveler v. Fleming, 91 Penn. St. 322, cited by appellant, is no doubt directly in point in support of the appellant's contention, but we are of the opinion that the proper rule is stated in the case above cited, and that the Pennsylvania court has run counter to the current of authority, and the justice of the matter."

There was no justification for this statement by the court, and there is nothing in the Hoeveler case to indicate that the Pennsylvania court ran counter to the current of authority on the subject which was involved in the case before the Illinois Court of Appeals. The Hoeveler case involved the question of eviction by the landlord of a tenant of an entire premises and not a construction of the exception to the common-law rule of liability of a tenant

in a case in which he is the lessee of only a room or apartment in a building when it is destroyed. What was stated by Mr. Justice Paxson was (p. 324):

"The modern doctrine as to what constitutes an eviction is, that actual physical expulsion is not necessary, but any interference with the tenant's beneficial enjoyment of the demised premises will amount to an eviction in law."

The landlord's insurance company having taken possession of the premises with the landlord's consent for the purpose of rebuilding, and being so possessed of it, the landlord giving directions as to repairs from time to time, and the tenant being kept out of possession from April until about the middle of August, to which occupation the lessees had not assented, the court held that there was an eviction of the tenant during the time that the repairs were being made, and he was not liable for the rent accruing during that time. The question of the determination of the lease was not at all involved in the case. Moreover, it was stated in the court's opinion (p. 326):

"And I have as little doubt they [the tenants] would have been responsible for the rent during the term if the plaintiff had been content to let the building stand roofless and scarred by fire during that period. The lease contained no exoneration from the rent in case of fire."

That is to say, had there been no eviction in the case, liability on the part of the tenant for the payment of rent would have continued, notwithstanding the damage done to the premises by fire and water, little or much. It is difficult to understand how the Illinois Court of Appeals could have assumed that this case ran "counter to the current of authority," because it is, in fact, in harmony with every authority; but, of course, the subject discussed and the point decided therein had no bearing whatever on the subject discussed and the point decided in the case before the Illinois court. Predicating his argument on this misconception of our case by the Illinois court, the plaintiff's counsel argues that the word "destroy" or "destruction," used in connection with the exception to the common-law rule of liability of a tenant as applied to a lessee of a portion of a building, does not mean in Pennsylvania what it has been adjudicated to mean in every other jurisdiction, but that it is sufficient in this jurisdiction to relieve the tenant to show that the damage prevents the use and the beneficial enjoyment of the premises by the tenant. There is, however, no basis for such distinction in the interpretation of the word "destroy" or "destruction." It has already been shown that the Hoeveler case is not in point. Likewise, the case of Camp v. Casey, 7 Pa. C. C. 160, because in that case it is assumed, in the opinion of the court, that "the building was destroyed by fire." The question of the extent of damage done is not discussed. The court states as a fact that the building was destroyed by fire; and then the court goes on to state the exception to the common-law rule of liability of a tenant that, "the lessee of an apartment in the upper story of a building where there is no covenant by either landlord or tenant to rebuild is discharged from his covenant to pay rent by the burning of the building so that the enjoyment of space in air demised to him becomes impracticable," which is but another way of saying that it was substantially destroyed. What was in the mind of the court with reference to the meaning of the word "destroyed" may be inferred from the facts in the case of Stockwell v. Hunter, 11 Metc. (52 Mass.) 448, cited at that point, in which it appeared that (p. 454) the whole building was consumed by fire to such an extent that it was required to rebuild anew.

Likewise, Paxson & Comfort Co. v. Potter, 30 Pa. Superior Ct. 615, does not support plaintiff's differentiation. This was a suit for rent against a

tenant of portions of two buildings. He filed an affidavit of defense averring that a part was "totally destroyed," that the landlord leased so much of the demised premises as had not been destroyed to other tenants, soon after the fire, who took possession. The court simply held that under the pleadings the plaintiff was not entitled to judgment; manifestly so, because, aside from the question of total destruction of part of the demised premises, the question of eviction was involved. The court said (p. 617) :

"A considerable part of the premises occupied by the defendant was as completely destroyed as if swallowed by the sea,"

which statement must have been predicated on the pleadings and possibly exhibits thereto in the nature of photographs. The question of degree of damage required to be done to amount to a "destruction" was not at all involved, but it may be assumed that the word was used in the same sense as used in other jurisdictions, because cases from other jurisdictions were cited by the court in support of its statement (p. 616) : "When the building is destroyed, nothing remains which the tenant can enjoy or claim.'

The case of Grossman v. McMahon, 63 Pa. Superior Ct. 191, is likewise not in point, being a case of eviction.

The case of McCabe's License, 11 Pa. Superior Ct. 560, is not in point, because the question of liability between landlord and tenant was not involved. The subject matter was entirely different. Under the Act of July 15, 1897, P. L. 297, transfer of liquor licenses from place to place was authorized in the case of "partial or complete destruction" of the premises. The court simply said that the act must be given a reasonable construction, having regard to the purpose for which it was passed, and it was not necessary for that purpose to construe the word as synonymous with "demolition," "breaking up in parts" or "pulling down;" that the meaning of the words of a statute is to be found not so much in a strictly grammatical or etymological propriety of language as in the subject or in the occasion on which they are used and the object to be obtained, citing Endlich on Interpretation of Statutes, § 73, and that it was sufficient for the purpose of appying the statute to show that the property had been rendered useless for the purpose intended; yet, notwithstanding this liberality of construction under the circumstances, the court agreed (p. 563) : "That the mere fact that the building had become untenantable for lack of ordinary repairs [is] not sufficient to give the court jurisdiction."

Of course, it is quite conceivable that a person would be entitled to the benefits of that act of assembly to have his license transferred to another place, and yet, under the common law, he would continue to remain liable for the rental of the first place under his lease. Merely because he might have his license transferred would have no possible effect on his liability for rent.

The other citation, Rebuilding Bridges by the Commonwealth, 23 Dist. R. 275, is not a "case" as stated by the plaintiff's counsel in his brief, but an opinion by Deputy Attorney General Hargest, with whom the writer served in that office and who is now president judge of the Court of Common Pleas of Dauphin County. There was an inquiry from the Board of Commissioners of Public Grounds and Buildings, whether a certain bridge over the Shenango River at Sharon was "destroyed" within the meaning of the Act of April 21, 1903, P. L. 230, so as to require its rebuilding by the Commonwealth. As stated by Mr. Hargest, the matter was in any event concluded against the Commonwealth because the report of the viewers found as a fact that the bridge was destroyed; and no exceptions to that finding were filed and the court had confirmed the report of the viewers ordering the bridge to be

rebuilt. The opinion was expressed, however: "It is quite evident that the thing which is now resting in the Shenango River is not a bridge. As a bridge, it has been destroyed, although all of its parts have not been rendered useless."

The case of the Moving Picture Co. v. Scottish Union and National Ins. Co., 244 Pa. 358, is likewise of no aid to the plaintiff, as the opinion in that case proceeds on the assumption that the building was "totally destroyed," so that the court applied (p. 363) "a well established rule of law that in case of a demise of an apartment in a building where no implication arises that by the demise any estate in the land was granted, the whole estate demised is extinguished with the destruction of the building and the tenant's liability for rent thereupon ceases," and all through the opinion the court refers to the "destruction of the building" as the basis for the decision. Heller v. Goldsmith, 14 D. & C. 746, proceeds on the same assumption that "a fire destroyed the premises." The case of Jacobs v. Mingle, 278 Pa. 250, cited by the plaintiff, has no bearing on the question before the court whatever.

The New York cases, such as Austin v. Field, 7 Abb. Pr. (N. S.) 29 (1869), are not in point. It was to meet what was assumed to be the rigorous rule of the common law that a statute was passed in New York, chapter 345, laws of 1860, relieving faultless lessees of a building of the further payment of rent in case it should be "destroyed or be so injured by the elements or any other cause as to be untenantable or unfit for occupancy," and the distinction between the common-law liability and that under the statute is evident from its terms, as pointed out in Decker v. Morton, 31 App. Div. 469; Suydam et al. v. Jackson, 54 N. Y. 450, and other cases.

It is plain to the court that the use of the words "destroyed" and "destruction" by the Pennsylvania courts in connection with the statement of the well-established exception to the common-law rule of liability of a tenant for rent under which exception a lessee of an apartment in a building is relieved of further payment of rent in case of the destruction of the building, or destruction of the leased premises, means that the subject matter of the lease must in fact be destroyed to operate as such a release of the tenant's common-law liability, and it is not sufficient to show that the premises have been damaged, on which account they may be, for the time being, untenantable; or to show that the tenant is deprived of the beneficial enjoyment of the premises merely. The term means that there must be a complete destruction of the premises, which, given a reasonable construction, would mean that there would have to be a destruction to such an extent as permanently to render the premises unfit for the purpose for which they were leased; that is to say, beyond repair and such as to require "building anew," as was aptly stated in one of the cases.

There is no such destruction of the leased premises in the case or anything approaching it. Indeed, but a small part of the leased premises was affected at all, and even that was not destroyed within the meaning of the term as applicable to a case of this kind. That the portion (if destroyed) of a leased premises, though but a small part of the whole, was the most valuable part of it, might furnish the basis for a very interesting inquiry as to whether the tenant in those circumstances would be relieved, but such is not the fact in the case before the court, so that it need not be discussed. It may be suggested, however, that the court would likely hold the parties to their contract.

The suggestion of eviction in the case, for it was no more than an innuendo, as it was not argued by the plaintiff, may be disposed of in a few words. There is no evidence in the case whatever that the landlord took possession of the premises and excluded the tenant. Some precautionary work was done

by or through the public authorities in the interest of public safety. This is not an eviction: Shapiro *v.* Malarkey, 278 Pa. 78; Fleming *v.* King, 100 Ga. 449, 28 S. E. 239. Moreover, had the landlord in this case done the work or if it should be assumed that he did, or that he ordered it, this would not relieve the liability of the tenant, because section ten of the lease between the parties specifically gives the right to the landlord to enter to make repairs, alterations, additions or improvements to the building, specifically providing also that such action shall in no way affect the payment of the rent at the time specified in the lease.

There are no other contentions in the case which require discussion.

### Conclusions of law.

(1) In the absence of an express provision to the contrary in a lease of real property, a lease of land on which there is a building is not terminated by an accidental injury to or the destruction of the building demised.

(2) An exception to the rule exists, however, where the lease is merely of a portion of a building and there are no convenants to repair or rebuild. In such cases, the destruction of the demised premises terminates the lease.

(3) Where the damage is merely such as causes a temporary interruption of the use of a portion of the property which may be repaired within a reasonable time and does not require building anew of the premises leased, there is no destruction of the premises within the meaning of the exception stated.

(4) The damage to a portion of the ceiling of the first floor front of No. 1024 Chestnut Street and to the bulk windows of said front was not a destruction of the demised premises. Accordingly, the lease in suit was not by reason of the occurrence of March 15, 1931, terminated, and a covenant of the plaintiff, the tenant, to pay rent for the balance of the term was not discharged thereby.

(5) The defendant lessor is entitled to have a judgment and finding entered adjudging that the plaintiff lessee is and remains bound to perform the terms, conditions and stipulations contained in the lease of May 21, 1926, and its supplement, on its part to be kept, performed and observed for the balance of the term of said lease.

(6) The defendant lessor is entitled to have a finding and/or decree entered that it has the right, option and privilege, without impairing the validity of the lease for the balance of the term, to enter upon the demised premises for the purpose of making repairs, alterations, additions and improvements to the demised premises or to the buildings of which the demised premises are a part, without liability for damages by reason of inconvenience and/or interruption to the plaintiff lessee arising from the making of any additions, alterations or repairs done in a reasonable manner.

(7) The defendant lessor is entitled to have a judgment entered against the plaintiff lessee for the rental due defendant lessor, together with costs.

(8) The defendant Kass is entitled to have the bill as against him dismissed, with costs.

### Decree nisi.

And now, to wit, May 1, 1931, the prothonotary is directed to enter a decree *nisi* in accordance with the foregoing adjudication, notify the parties of the filing of this adjudication, and that unless exceptions are filed thereto within ten days, a final decree will be entered in accordance therewith.